Robert Spretnak, Esq.
Bar No. 5135
8275 S. Eastern Avenue, Suite 200
Las Vegas, NV 89123
Telephone: 702.454.4900
Email: bob@spretnak.com
Local Counsel for Plaintiffs

Giselle Schuetz
Friedman & Houlding, LLP
1050 Seven Oaks Lane
Mamaroneck, NY 10543
Telephone: 888-369-1119 x8
Email: giselle@friedmanhouldingllp.com
To Be Admitted *Pro Hac Vice*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| JESSICA KING,<br><br>  Plaintiff,<br><br>v.<br><br>CONBRACO INDUSTRIES, INC.<br><br>  Defendant. | Case No.: 3:20-cv-141<br><br><br><br>**CIVIL ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff JESSICA KING by and through her undersigned counsel complains as follows:

### PARTIES, VENUE, ADMINISTRATIVE EXHAUSTION

1. This is a hostile work environment sex harassment and retaliation case brought pursuant to 42 U.S.C. § 2000e et seq. ("Title VII").

2. Plaintiff Jessica King ("Plaintiff") is a woman and a citizen of the state of Nevada, residing in Lyon County, Nevada. At all relevant times herein she worked as a Billing Clerk for Defendant.

3. Defendant Conbraco Industries, Inc. ("Conbraco" or "Defendant") is a North Carolina

corporation with its principal place of business in Matthews, NC. Conbraco is a manufacturer of plumbing valves and fittings.

4.  Defendant is an employer within the meaning of Title VII.

5.  Plaintiff exhausted her administrative remedies with the Equal Employment Opportunity Commission, and received a Notice of Right to Sue. This Complaint is being timely filed.

6.  This Court has jurisdiction pursuant to 28 U.S.C. Sec. 1343. Venue is proper in this district based on Title VII's venue provisions, in that the majority of the conduct complained of took place within the District of Nevada.

## FACTUAL ALLEGATIONS

7.  Plaintiff King began working for Conbraco in or about August 2016.

8.  As a Billing Clerk, Ms. King printed orders, filed documents, and performed other administrative tasks as necessary to manage the office.

9.  Her supervisor was Chris Gaarenstroom, Warehouse Manager.

10. Laura Heitzman was National Human Resource Coordinator for Conbraco.

11. In or about January 2018, Gaarenstroom invited Ms. King to a social outing, giving her the impression that a group of co-workers would attend together. With that understanding, she agreed to attend.

12. When Ms. King arrived, she was embarrassed to discover that only Gaarenstroom had shown up. During the outing Gaarenstroom told Ms. King that he was divorcing his wife. He further told her that he was promoting her to a position that he would newly create. Ms. King drove him to his car and went home.

13. Following that outing, Gaarenstroom began sending Ms. King personal text messages at night.

14. Gaarenstroom asked Heitzman to create a position with higher pay than Ms. King's, and with a new title, but Heitzman told him she was unable to do so.

15. In or about February or March 2018, Gaarenstroom offered Ms. King the opportunity to train the employees in a new warehouse Defendant had opened. For Ms. King, performing the training would provide her the opportunity demonstrate her value as an employee and to build her resume. She therefore accepted the opportunity.

16. Gaarenstroom approached Ms. King a few weeks before the date for the training, and asked her to travel to Canada early to spend the weekend there with him before the training.

17. After considering the request and feeling uncomfortable by it, Ms. King told Gaarenstroom that she was unwilling to arrive early to spend the weekend with him, and wished instead to arrive on time for the beginning of the training on Monday.

18. Because of this refusal, Gaarenstroom rescinded Ms. King's authorization to make the trip and conduct the training.

19. In or about February 2018, Gaarenstroom bought tires for Ms. King's car, and told her that the gift was "no strings attached," and that he just wanted to do something nice. Ms. King attempted to pay him back for the tires, but Gaarenstroom told her no. She therefore accepted the gift.

20. Gaarenstroom engaged in sexually harassing conduct, including but not limited to text messages, sexual come-ons, and romantic advances, several times per week from in or about April 2018 through the end of Ms. King's employment.

21. For example, beginning in April 2018, Gaarenstroom began texting Ms. King several times per week with harassing commentary on her appearance and come-ons, including but not

limited to statements such as "those pants look good on you today," and "you look prettier than a set of mud tires."

22. Ms. King was intimidated and offended by the text messages. She asked Gaarenstroom to stop sending them, and told him it was making everyone in the office uncomfortable.

23. Despite her request, Gaarenstroom continued to text Ms. King offensive messages.

24. Gaarenstroom told Ms. King he couldn't find "a woman to be friends with benefits[,]" referring to finding a woman for sex.

25. In or about May 2018, Ms. King's boyfriend brought her lunch to work, which Gaarenstroom observed. Gaarenstroom behaved in an overtly angry manner toward Ms. King for the remainder of the day and the following week, slamming doors and refusing to speak with Ms. King.

26. In or about mid-May 2018, Ms. King called out of work, saying that she was sick to her stomach. Gaarenstroom asked Ms. King if he could "come over to hold her hair." She said no.

27. Later that day, Ms. King was sleeping while she was ill at home. When she awoke, she found numerous text messages from Gaarenstroom saying that he had gotten lunch for her and had come to her home with it.

28. Since she had never given Gaarenstroom her address, Ms. King asked via text message how he knew it. Gaarenstroom wrote out her address and asked if it was correct, but he would not tell her how he knew. She felt intimidated and concerned for her privacy, and did not respond.

29. In late May 2018, on Ms. King's birthday, Gaarenstroom left a gift card for a massage on her desk. Inside the card he had signed "C" for Chris, and had written, "when that runs out I have two working hands."

30. Gaarenstroom continued to send Ms. King come-ons via text message, for example but not limited to, "are all the boys infatuated with you or is it just me?" Ms. King did not respond to these messages.

31. Gaarenstroom asked female employees who worked in the office for Ms. King's information on social media.

32. Shortly after her birthday, Ms. King's boyfriend visited her workplace again for lunch, and Gaarenstroom resumed slamming doors and refusing to speak with her.

33. Only days after Ms. King's boyfriend visited her workplace, on June 12, 2018, Gaarenstroom issued her a disciplinary write-up for the first time ever, baselessly alleging multiple different problems with her performance.

34. Neither Gaarenstroom nor any other Conbraco employee had ever complained to Ms. King about her work performance prior to Gaarenstroom's disciplinary write-up.

35. Ms. King asked Gaarenstroom why she had received a write-up in light of the fact that she had not received any prior complaints about her work performance. He stated that Laura Heitzman, in Human Resources, had made the decision.

36. In or about mid-June 2018, Ms. King met with Heitzman to inquire why she had been written up. Heitzman, Defendant's Human Resources manager, told Ms. King she had no idea why Gaarenstroom wrote Ms. King up. Heitzman said that she had received a text from Gaarenstroom informing her that she needed to issue a disciplinary write-up to Ms. King.

37. Ms. King explained to Heitzman that she had been consistently rejecting Gaarenstroom's sexual advances. Heitzman responded that Gaarenstroom was retaliating against her, and that Ms. King needed to make a written sexual harassment complaint to keep her job. Ms. King made a written complaint about the sexual harassment she had been experiencing.

38. Heitzman reported Gaarenstroom's behavior to her supervisor Courtney Solarek, Director of Human Resources, on the same date she received Ms. King's written complaint.

39. Solarek brushed off Heitzman's report, merely saying that they would "talk to Chris about it." She did not follow up with Heitzman about the issue after this conversation.

40. Shortly after her written complaint, Ms. King sustained an accident outside of work that caused her to require an FMLA leave during her recovery. During the approximately ten-day leave, Heitzman told Ms. King that her sexual harassment complaint was being addressed.

41. Heitzman interviewed several employees, who substantiated Ms. King's complaint in ways including, but not limited to, one employee confirming she had seen harassing text messages Gaarenstroom sent to Ms. King, and another employee confirming she had.

42. Heitzman issued a disciplinary write-up to Gaarenstroom despite Solarek's indifference. However, she did not believe that such a letter was adequate remedial action in the context of Gaarenstroom's conduct and the evidence confirming Ms. King's complaints, and she observed that the company was taking no other action.

43. Not long after he received the write up, Gaarenstroom directed Heitzman to find any possible reason to fire Ms. King.

44. He stated that Ms. King was "on the chopping block" and that if she violated anything, Heitzman should find a record of it and terminate Ms. King's employment.

45. Gaarenstroom discovered that Ms. King was late in turning in doctor paperwork relating to her request for FMLA leave, and directed Heitzman to immediately terminate her for an attendance violation.

46. Multiple prior Conbraco employees had either failed to turn in their paperwork by the required date, or required more leave than FMLA would have provided, but Conbraco nonetheless consistently permitted them to take the leave they needed for medical concerns.

47. For example, during the year prior, Conbraco had permitted an employee to take medical leave of nearly a year, well in excess of the time to which she was entitled under FMLA, due to a premature birth.

48. Nonetheless, on or about July 5, 2018, when Ms. King returned from her leave, Heitzman directed Ms. King to meet with her in a conference room.

49. At the time Ms. King returned, Conbraco had already received the required FMLA doctor paperwork.

50. Heitzman told Ms. King that the company had done research and found that Ms. King's attendance was poor, and therefore they would be terminating her.

51. The year before, Ms. King had received an award for perfect attendance.

52. Heitzman directed Ms. King to sign a letter of resignation even though she was purportedly being terminated for attendance.

53. After her termination, Ms. King contacted Courtney Solarek to ask about the resolution of her sexual harassment complaint.

54. Solarek told Ms. King she could not give her any information.

55. Solarek never took any action on Ms. King's complaint. Heitzman was concerned by the lack of action, so she spoke again with Solarek, who stated that Gaarenstroom really didn't do anything wrong and that she wanted all the talk about this issue to stop.

56. Frustrated by Defendant's failure to act, Heitzman reached out to Solarek's superiors in Defendant's main corporate office concerning the sexual harassment complaint.

57. Solarek terminated Heitzman's employment shortly afterward.

58. At first, Solarek told Heitzman that her position was being moved to the company's North Carolina offices. When Heitzman offered that she was willing to move there, Solarek stated that actually Heitzman was being terminated for her performance.

59. Solarek told Heitzman that she was being terminated because the company did not feel confident in her HR abilities, and for being "too involved in other people's business," which Heitzman understood to refer to her insistence that Ms. King's complaint was being handled improperly.

60. Heitzman, who had worked for Defendant for over two years by that time, had received positive performance reviews shortly before her termination.

61. Upon information and belief, Gaarenstroom remains Warehouse Manager at Defendant.

## COUNT I
## Hostile Work Environment in Violation of Title VII

62. Plaintiff incorporates by reference all preceding paragraphs.

63. Defendant engaged in illegal, intentional discrimination by creating a hostile work environment because of Plaintiff's female sex.

64. As a consequence of Defendant's conduct, Plaintiff suffered emotional distress.

65. Defendant's actions proximately caused Plaintiff's injuries.

## COUNT II
## Retaliation in Violation of Title VII

66. Plaintiff incorporates by reference all preceding paragraphs.

67. Defendant engaged in illegal retaliation by, inter alia, terminating Plaintiff's employment in retaliation for her complaints of sex discrimination.

68. As a consequence of Defendant's conduct, Plaintiff suffered emotional distress.

69. Defendant's actions proximately caused Plaintiff's injuries.

## COUNT III
## Intentional Infliction of Emotional Distress Under Nevada Law

70. Plaintiff incorporates by reference all preceding paragraphs.

71. Defendant engaged in extreme and outrageous conduct with the intention of, or reckless disregard for, causing Ms. King emotional distress, by engaging in actions including but not limited to disciplining and terminating her for making harassment complaints, and terminating the Human Resources employee who advocated for handling her complaint appropriately.

72. As a consequence of Defendant's conduct, Plaintiff suffered severe emotional distress.

73. Defendant's actions proximately caused Plaintiff's injuries.

## JURY DEMAND

Plaintiff demands a trial by jury for all issues in this action for which a jury is available.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court grant the following relief:

A. Declare Defendant's conduct complained of herein to be in violation of Plaintiff's rights as secured by 42 U.S.C. §2000;

B. Award Plaintiff compensatory damages to be determined by the jury at the time of trial;

C. Award Plaintiff back pay and front pay to be determined at the time of trial;

D. Award Plaintiff punitive damages to be determined by the jury at the time of trial;

E. Award Plaintiff reasonable attorneys' fees and costs, including the fees and costs of experts, incurred in prosecuting this action; and

F. Grant such further relief as the Court deems necessary and proper.

Dated: February 28, 2020
   Las Vegas, NV

                Respectfully submitted,

                Local Counsel:

                LAW OFFICES OF ROBERT SPRETNAK

                *By:* /s/ Robert Spretnak
                Robert Spretnak, Esq. (Bar No. 5135)
                8275 S. Eastern Avenue, Suite 200
                Las Vegas, NV 89123
                Telephone: 702.454.4900
                Fax: 702.938.1055
                Email: bob@spretnak.com
                Local Counsel for Plaintiffs

                FRIEDMAN & HOULDING, LLP

                *By:* /s/ Giselle Schuetz
                Giselle Schuetz
                Friedman & Houlding, LLP
                1050 Seven Oaks Lane
                Mamaroneck, NY 10543
                888-369-1119 x8
                Fax: 866-731-5553
                giselle@friedmanhouldingllp.com

                *To Be Admitted Pro Hac Vice*